FOR PUBLICATION

# JUDICIAL COUNCIL OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br><br>COMPLAINT OF JUDICIAL MISCONDUCT | No. 03-89037<br><br>ORDER |

Filed September 29, 2005

Before: Arthur L. Alarcón, Alex Kozinski,
Andrew J. Kleinfeld, M. Margaret McKeown and
William A. Fletcher, Circuit Judges, and EZRA, LEVI,
McNAMEE, STRAND and WINMILL, District Judges.

Order;
Partial Concurrence and Partial Dissent by Judge Ezra;
Dissent by Judge Kozinski;
Dissent by Judge Winmill

---

## ORDER

A misconduct complaint was filed against a district judge of this circuit pursuant to 28 U.S.C. § 372(c) (now 28 U.S.C. § 351(a)) in February 2003. The Chief Judge entered an Order and Memorandum dismissing the complaint on July 14, 2003. The Judicial Council entered an Order vacating and remanding to the Chief Judge for further proceedings on December 18, 2003. After further investigation, the Chief Judge entered a Supplemental Order and Memorandum on November 4, 2004, again dismissing the complaint. Complainant has filed a petition for review of the Chief Judge's November 4th Order.

Complainant alleges that the district judge acted for inappropriate personal reasons in placing a "comely" female crim-

13797

inal defendant on probation "to himself, personally," and in withdrawing the reference in the bankruptcy proceeding of this probationer in order to "benefit an attractive female." The claim asserted in the complaint is that the judge "acted inappropriately to benefit an attractive female" and requested that "this matter be appropriately investigated to determine, among other things, the actual relationship" between the probationer and the judge. An investigation was made of the allegation.

Complainant's suggestion of an inappropriate personal relationship with the probationer is entirely unfounded. This district judge has for many years directed criminal probationers, both male and female, to appear before him personally during their probationary period. In all cases, the district judge's personal meeting with the probationer is in the company of the probation officer. The probationer in this case was supervised in the same manner as other probationers supervised by this district judge, as described in an affidavit by her probation officer.[1]

The withdrawal of the reference by the district judge was dealt with by the court of appeals in *In re Canter*, 299 F.3d 1150 (9th Cir. 2002). The court held that the district judge had abused his discretion in withdrawing the reference and in staying eviction proceedings against the probationer.

The district judge withdrew the reference on February 17, 2000, and stayed the eviction proceedings on February 29. While evaluating the misconduct complaint now before us, the Chief Judge learned that in July 2001 the district judge

---

[1]The court's supervision of a probationer does not involve additional parties or require adversary legal proceedings unless the probation officer asks the court to revoke probation because of an alleged violation of a condition of probation. The conditions of probation, and, therefore, the supervision of a probationer, often focus on the probationer's living arrangements and economic circumstances. *See* 18 U.S.C. § 3563(a)(7), (b)(1), (b)(2), (b)(13), and (b)(19).

transferred the bankruptcy proceeding to another district judge to allow the second judge to evaluate the propriety of the withdrawal of the reference. The second judge re-referred the proceeding to the bankruptcy court in September 2001. The bankruptcy court granted the trustee's motion to abandon the estate's interest in the residence in question in January 2002.

The Judicial Council's remand to the Chief Judge indicated concern that the district judge may have received an improper ex parte letter from the probationer, and that the withdrawal of the reference may have been based on information contained in the alleged letter. After an investigation, the Chief Judge found that no such letter had been transmitted to, or received by, the district judge. We will not upset that factual finding. Further, any other impropriety in the district judge's receipt of information from the probationer during his personal meeting with her, and in the withdrawal of the reference based on that information, has been the subject of appropriate corrective action by the court of appeals, which held that there had been an abuse of discretion, and by the district judge's own earlier action in transferring the bankruptcy proceeding to another district judge.

On May 18, 2005 the Judicial Council communicated with the district judge setting forth with specificity the nature of the inappropriate conduct that he had engaged in relating to the withdrawal of the reference of the Canter bankruptcy and setting forth the necessity for appropriate and sufficient corrective action including an acknowledgment by the district judge of his "improper conduct" and a "pledge not to repeat it."

In response to the Judicial Council's communication, the district judge, in a written response from his lawyers, advised that, ". . . he has carefully reflected upon the underlying events surrounding this proceeding. Upon reflection, he recognizes that if he had articulated his reasons for withdrawing

the reference and re-imposing the stay, and his underlying concerns that led to those actions, misunderstandings by the parties could have been prevented. As would any dedicated jurist, he believes those types of misunderstandings should be avoided wherever possible, and he recognizes that it was unfortunate they occurred in this situation. He does not believe that any similar situation will occur in the future."

We are satisfied that adequate corrective action has been taken such that there will be no re-occurrence of any conduct that could be characterized as inappropriate. In response to the dissents, it is important to note that the overall purpose of the Judicial Conduct and Disability Act is not to punish but to protect the judicial system and the public from further acts by a judicial officer that are detrimental to the fair administration of justice. *See Rule 1 of the Rules of the Judicial Council of the Ninth Circuit Governing Complaints of Judicial Misconduct or Disability* ("The law's purpose is essentially forward-looking and not punitive. The emphasis is on correction of conditions that interfere with the proper administration of justice in the courts."). As the procedural history of this complaint amply demonstrates, the Council has given close and diligent attention to this matter over a period of many months. Although the specific allegation raised by the complainant of judicial action in exchange for sexual favors is as straightforward as it is without merit, the additional issues that have been raised along the way in the course of the Council's inquiry are factually and legally complex. It is not surprising that all members of the Council do not agree on the correct resolution of these issues. Indeed, it is even a fair question whether these additional matters are properly within the scope of the complaint. Assuming that they are, the Council's finding of corrective action is a considered judgment, based on the circumstances of this case, that is specifically authorized by the rules that govern these proceedings. *See Rule 14(d).* A finding of corrective action is not a cover up or a whitewash; it is a finding that adequate steps have been taken to assure that the conduct will not be repeated, whether or not the con-

duct crosses over the line from inappropriate conduct to misconduct.

Judge Kozinski suggests that the Council's goal is to avoid "hurting the feelings of the judge" who is the subject of the complaint. Dissent at 13831. Not so. Our goal in these proceedings is to maintain the integrity of the judiciary, not to cater to hurt feelings. Compared to many of the decisions we are called upon to make, decisions on misconduct complaints do not make any special claim on a judge's intellectual integrity or personal courage. Any judge who feels that his or her impartiality might be affected because of a personal relationship to the judge about whom a complaint is made must recuse. Otherwise, it is our duty to consider the complaints objectively, without bias for or against the judge or the complainant. This is not an onerous duty, and we gladly accept it.

The Judicial Council finds that appropriate corrective action has been taken in this case and we therefore AFFIRM the November 4, 2004, Order of the Chief Judge dismissing the complaint.

---

EZRA, Chief District Judge, partially concurring and partially dissenting:

This complaint of misconduct is a complex and difficult one that it is exacerbated by the unproven, and as far as I can discern from the record unfounded, insinuation of licentious conduct on the part of the District Judge with respect to his dealings with Ms. Canter. With respect to those allegations of personal misconduct I join with both the majority and Judge Winmill's dissent and would affirm the Chief Judge's dismissal of that portion of the complaint as well as the allegations surrounding the so called letter.

However, in my view the record is insufficient with regard to the remainder of the complaint and I therefore regretfully cannot join the majority in affirming the Chief Judge's disposition of the remaining allegations. I would remand to the Chief Judge for further proceedings in order to allow the record to be more fully developed with respect to the bankruptcy stay ordered by the District Judge and the District Judge's motivation behind it.

I wish to make it clear that by this partial dissent I am not suggesting a finding of misconduct should be made. It is my view that given the serious nature of the allegations and the points made by both the majority and the two dissents that further fact finding with appropriate input from those implicated needs to be undertaken before a conclusion either way can be reached under our standard of review.

---

KOZINSKI, Circuit Judge, dissenting:

Passing judgment on our colleagues is a grave responsibility entrusted to us only recently. In the late 1970s, Congress became concerned that Article III judges were, effectively, beyond discipline because the impeachment process is so cumbersome that it's seldom used. *See* 126 *Cong. Rec.* S28091 (daily ed. Sept. 30, 1980) (statement of Sen. DeConcini). At the same time, Congress was aware of the adverse effects on judicial independence if federal judges could be disciplined by another branch of government using means short of impeachment. *See* S. Rep. No. 96-362, at 6 (1979), *reprinted in* 1980 U.S.C.C.A.N. 4315, 4320. The compromise reached was to authorize federal judges to discipline each other. *See* 126 *Cong. Rec.* S28091. We are unique among American judges in that we have no public members— lawyers or lay people—on our disciplinary boards. *See* American Judicature Society, *Appendix C: Commission*

*Membership*,  *at*  http://www.ajs.org/ethics/pdfs/Commission
%20membership.pdf (revised Aug. 2003) (listing disciplinary
procedures for all state judges). Rather, judicial discipline is
the responsibility of the circuit judicial councils—bodies
comprised entirely of Article III judges. *See* Judicial Councils
Reform and Judicial Conduct and Disability Act of 1980, Pub.
L. No. 96-458, 94 Stat. 2035 (1980).

Disciplining our colleagues is a delicate and uncomfortable
task, not merely because those accused of misconduct are
often men and women we know and admire. It is also uncom-
fortable because we tend to empathize with the accused,
whose conduct might not be all that different from what we
have done—or been tempted to do—in a moment of weakness
or thoughtlessness. And, of course, there is the nettlesome
prospect of having to confront judges we've condemned when
we see them at a judicial conference, committee meeting,
judicial education program or some such event.

Pleasant or not, it's a responsibility we accept when we
become members of the Judicial Council, and we must dis-
charge it fully and fairly, without favor or rancor. If we don't
live up to this responsibility, we may find that Congress—
which does keep an eye on these matters, *see, e.g.*, *Operations
of Fed. Judicial Misconduct Statutes: Hearing Before the
Subcomm. on Courts, the Internet, and Intellectual Prop. of
the House Comm. on the Judiciary*, 107th Cong. (2001);
*Report of the Nat'l Comm'n on Judicial Discipline and
Removal* (1993)—will have given the job to somebody else,
materially weakening the independence of the federal judi-
ciary.

For the reasons I explain below, I believe the judge who is
the subject of the complaint in this case has committed serious
misconduct by abusing his judicial power. *See* Jeffrey M.
Shaman, Steven Lubet & James J. Alfini, *Judicial Conduct
and Ethics*, § 2.07, at 50 (3d ed. 2000) [hereinafter Shaman,
Lubet & Alfini] ("Judges abuse the power of the judicial

office when they abbreviate or change critical aspects of the adversary process in ways that run counter to the scheme established by relevant constitutional and statutory law."). Some may disagree, as a majority of the judicial council apparently does. But I hope that, by the time I've finished writing, my reasons will be clear. To that end, I must do what the majority eschews—discuss the unusual and uncomfortable facts presented by the record before us.

Many of the facts are already public, having been discussed by the court of appeals in *In re Canter*, 299 F.3d 1150 (9th Cir. 2002). *Canter* grew out of a bankruptcy case involving Deborah Canter who, at the time, was undergoing a messy divorce from her husband Gary. During their married life, the couple had lived in a house on Highland Avenue in Los Angeles; the house was owned by Gary's parents, who transferred title to the Canter Family Trust in 1997. Gary paid rent while he and Deborah were living there. When the couple separated in 1999, Gary moved out, leaving Deborah in possession; the rent payments stopped.

The Trust brought an unlawful-detainer action against Deborah seeking eviction and back rent, and the case was set for trial on October 26, 1999. Twenty-four minutes before trial was to start, Deborah filed a bankruptcy petition, which automatically stayed the unlawful-detainer case. *See* 11 U.S.C. § 362. Three months later, on January 26, 2000, the bankruptcy court lifted the automatic stay on a motion filed by the Trust. Deborah, represented by attorney Andrew Smyth, did not file an opposition. Thereafter, the Trust and Deborah—again represented by counsel—signed a stipulation. Based on that stipulation, the state unlawful-detainer court on February 7, 2000, ordered Deborah to vacate the Highland Avenue premises.

At that point, lightning struck. Without notice, without warning, without giving the Trust an opportunity to oppose, without so much as a motion, the district judge who is now

the subject of this disciplinary complaint withdrew the case from the bankruptcy court. Twelve days later, the same judge entered a second order, enjoining the state-court judgment evicting Deborah. Like the withdrawal order, the injunction was not preceded by the usual processes to which we are accustomed in American courts, such as a petition from the party seeking the relief or a response from the opposing side. In fact, no one knew why the district judge had done what he did—the order gave no reasons, cited no authority, made no reference to a motion or other petition, imposed no bond, balanced no equities. The two orders were a raw exercise of judicial power, the net effect of which was to let Deborah Canter live in the Highland Avenue property rent-free. Just how raw this exercise of power was became clear—if it was not already—when the Trust twice asked the judge to lift the stay, and was twice met by summary denials.

The so-called hearing on the second of these motions gives a pretty good flavor of the judge's attitude in this matter. The motion (and an unrelated motion) were argued together on June 18, 2001—after Deborah Canter had occupied the property for some 15 months past the eviction judgment. Deborah was present (apparently pro se), but said nothing of substance. After counsel for the Trust soliloquized for about a page of transcript, we find the following unilluminating exchange:

> THE COURT:    Defendants' motion to dismiss is denied, and the motion for lifting of the stay is denied—I'm sorry. The motion to dismiss is granted with ten days to amend.
>
> MR. KATZ:    And the motion to lift the stay is denied?
>
> THE COURT:    Denied; that's right.
>
> MR. KATZ:    May I ask the reasons, your Honor?

THE COURT:    Just because I said it, Counsel.

I could stop right here and have no trouble concluding that the judge committed misconduct. It is wrong and highly abusive for a judge to exercise his power without the normal procedures and trappings of the adversary system—a motion, an opportunity for the other side to respond, a statement of reasons for the decision, reliance on legal authority. These niceties of orderly procedure are not designed merely to ensure fairness to the litigants and a correct application of the law, though they surely serve those purposes as well. More fundamentally, they lend legitimacy to the judicial process by ensuring that judicial action is—and is seen to be—based on law, not the judge's caprice. The district judge surely had the *power* to enjoin enforcement of the state-court eviction judgment once he assumed jurisdiction over the bankruptcy case, but he could legitimately exercise that power only if he had sufficient legal cause to do so. Here, the judge gave no indication of why he did what he did, and stonewalled all the Trust's efforts to find out.

Nor is there anything in the record that would suggest a legal basis for the judge's action. Canter might have appealed the bankruptcy court's order lifting the stay, but she didn't. She might also have filed a motion asking the district court to withdraw the reference and enjoin the state-court judgment. Had she done so, we could have gleaned from her motion some legal theory supporting the injunction. But Canter didn't do that either, so we're left in the dark as to what legal basis the judge might have had for enjoining the state's lawful processes. Judicial action taken without any arguable legal basis —and without giving notice and an opportunity to be heard to the party adversely affected—is far worse than simple error or abuse of discretion; it's an abuse of judicial power that is "prejudicial to the effective and expeditious administration of the business of the courts." *See* 28 U.S.C. § 351(a); Shaman, Lubet & Alfini, *supra*, § 2.02, at 37 ("Serious legal error is more likely to amount to misconduct than a minor mistake.

The sort of evaluation that measures the seriousness of legal error is admittedly somewhat subjective, but the courts seem to agree that legal error is egregious when judges deny individuals their basic or fundamental procedural rights."); *In re Quirk*, 705 So. 2d 172, 178 (La. 1997) ("A single instance of serious, egregious legal error, particularly one involving the denial to individuals of their basic or fundamental rights, may amount to judicial misconduct." (citing Jeffrey M. Shaman, *Judicial Ethics*, 2 Geo. J. Legal Ethics 1, 9 (1988))).

But, of course, there's more. Federal district judges don't withdraw the reference in bankruptcy cases for no reason, and they don't enjoin state-court judgments sua sponte unless they have some information about the case that persuades them to do so. Because the district judge had no prior involvement in the bankruptcy case, and no motion was filed challenging the propriety of the bankruptcy court's order lifting the automatic stay, we can infer that the judge learned about the case some other way. And, sure enough, Deborah Canter was no stranger to the district judge. At about the time she was involved in her divorce proceedings with Gary, Deborah was also the defendant in a criminal case where she was charged with false statements in violation of 18 U.S.C. § 1001, and loan fraud in violation of 18 U.S.C. § 1014. That case was pending before this district judge and he had placed Deborah on probation after she pled guilty to four counts.

When this complaint was before the Judicial Council on a prior occasion, we wrote the district judge and asked him whether the bankruptcy case was assigned to him by random assignment (a process known as the "wheel") or in some other fashion. We also inquired as to his reasons for staying the state-court proceedings. This is what he said:

> There is no wheel for the purpose of withdrawing the reference in a bankruptcy matter.[1] I felt it was

---

[1]The district judge is correct, strictly speaking, in saying that "[t]here is no wheel for the purpose of withdrawing the reference in a bankruptcy

related to my program of working with probationers to help their rehabilitation. I have been doing this for more than 25 years and have been told by the Probation Officer that it is a successful program. *In this case a person who was a probationer in a criminal case informed me that the home in which she and her husband were living at the time of their divorce had been given to them by her husband's parents.* She was still living in the house with her 8 year old daughter and was in divorce proceedings. *She was contesting her right to occupancy in the divorce court and I felt it should be finalized there so I re-imposed the stay to allow the state matrimonial court to deal with her claim. From her explanation of the proceedings in the state court it appeared to me that her counsel had abandoned her interest so it could not be adequately presented to the state court.* Counsel for her husband had asked the Probation Officer to release Mrs. Cantor's [sic] probation report so it would be used in the divorce proceedings. I denied that request upon the recommendation of the Probation Officer.

. . .

I have no exact memory of any specific conversation with Mrs. Canter concerning the withdrawal of the reference in the bankruptcy matter. But what I can re-construct from the records I have in the crimi-

matter," but only insofar as it applies to sua sponte withdrawals—withdrawals by the district court without a motion. According to the clerk of the district court, if a party files a motion seeking withdrawal of the reference, the case is assigned randomly according to the "wheel." Sua sponte withdrawals are very rare, so rare in fact that the district court clerk only "recalled one other instance of such withdrawal, so long ago that she could not remember the name of the judge, but she believed it was a judge who has long since retired."

nal case is that *at a 120 day meeting with Mrs. Canter in connection with her performance of community service advised me that there was an unlawful detainer action pending in the Municipal Court to evict her from the property in which she and her minor daughter were living that was nominally owned by the senior Canters but was given to them when she married her then estranged husband.*

I have that recollection because shortly after that meeting and my withdrawal of the reference in the bankruptcy case Mrs. Canter's lawyer *in the criminal matter* filed an application for an order to show cause to find counsel for Gary Canter in the matrimonial matter and counsel for Alan Canter (Gary's father) in the bankruptcy matter in contempt for filing a copy of Mrs. Canter's confidential probation report against her privacy interest in both courts, matrimonial and bankruptcy. After a hearing on the order to show cause it was discharged by stipulation of counsel to withdraw the probation reports although I never learned how the probation report got into the hands of counsel in the matrimonial or bankruptcy matter in the first instance. (Emphasis added.)

The district judge's response confirms what common sense suggests: His actions in sua sponte seizing control of the bankruptcy case and enjoining the state-court judgment were not random events; they were taken in direct response to communications he had with Deborah Canter—the bankruptcy debtor—during the course of supervising her criminal probation. As the judge admits, he formed certain impressions about the state-court proceedings based on Canter's representations to him, and concluded that possession of the Highland Avenue property should be "finalized" during the course of the matrimonial proceedings, so he enjoined the unlawful-

detainer judgment.[2] In addition, he believed—again based entirely on what Canter told him—that "her counsel had abandoned her interest so it could not be adequately presented to the state court." The judge also suggested that maintaining her in possession of the Highland Avenue property would "help [her] rehabilitation."

The judge's explanation does not provide a lawful basis for his actions. He cites no statute, regulation or caselaw that authorized him, even arguably, to enjoin the state-court judgment. His belief that the debtor was badly served by her lawyer in the state-court proceedings, even if it were based on anything more than the debtor's unilateral complaint, provides no authority for exercising federal power under the Bankruptcy Act to interfere with the state-court judgment.[3] Nor does the judge's belief that the debtor's rehabilitation would

---

[2]There is cause to doubt the district judge's explanation. *See* p. 13827 *infra*. For present purposes, however, I accept it at face value.

[3]As noted by the court of appeals in *In re Canter*, injunctions under the bankruptcy power may only be issued to protect the integrity of the bankruptcy estate:

> In staying enforcement of the municipal court judgment, the district court was acting pursuant to its powers under 11 U.S.C. § 105(a). Section 105(a) authorizes the district court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [Title 11]." *Walls* v. *Wells Fargo Bank, N.A.*, 276 F.3d 502, 506 (9th Cir. 2002). Section 105(a) "contemplates injunctive relief in precisely those instances where parties are pursuing actions pending in other courts that threaten the integrity of a bankrupt's estate." *In re Baptist Med. Ctr. of N.Y.*, 80 B.R. 637, 641 (Bankr. E.D.N.Y. 1987) (citations and internal quotation marks omitted).

*In re Canter*, 299 F.3d at 1155 (footnote omitted). There is plainly no authority to issue an injunction pursuant to section 105(a) for the purpose of providing the debtor a warm place to live at the expense of the creditors. Indeed, Congress has provided that a federal court may not enjoin a state-court judgment, unless specifically authorized by Congress or in aid of its jurisdiction. *See* 28 U.S.C. § 2283. The district judge's injunction was, thus, not merely unauthorized, it was unlawful."

be helped if she remained in the Highland Avenue property provide a lawful basis for the injunction. We so ruled in our previous order:

> The debtor, represented by her counsel, had stipulated to a judgment requiring her to vacate the premises, and the unlawful detainer court had entered the judgment. The district judge acted based on his belief that the dispute over possession of the property should be "finalized" in the divorce proceeding rather than the unlawful detainer proceeding, because "it appeared to . . . [him] that her counsel had abandoned her interest so it could not be adequately presented to the state court." However, we are not aware of any authority for a bankruptcy court to determine whether parties in state court proceedings were adequately represented by their counsel. Nor are we aware of any authority allowing the district court to allocate jurisdiction between two state courts dealing with related subject matter.
>
> That the district judge believed his actions would help his probationer's rehabilitation is of no consequence. A judge may not use his authority in one case to help a party in an unrelated case. Exercise of judicial power in the absence of any arguably legitimate basis can amount to misconduct.

Judicial Council Order (Dec. 18, 2003) at 5-6 (alterations in original). (For ease of reference, I attach a copy of our earlier order as an Appendix.)

The judge's response, moreover, adds a further dimension to his misconduct: His orders were not merely lacking in lawful authority, they were based on ex parte communications from the debtor for whose benefit those orders were entered. *See* Shaman, Lubet & Alfini, *supra*, § 5.01, at 160 ("At the very least, participation in *ex parte* communications will

expose the judge to one-sided argumentation . . . . At worst, [it] is an invitation to improper influence if not outright corruption.").[4] By his own admission, the judge seized the case from the bankruptcy court so he could enter an injunction that would allow the debtor to remain in the Highland Avenue property. He did so based on information given to him by the debtor during the course of the criminal proceedings when the trustees and their lawyers were absent. In our earlier order we also ruled that this conduct was improper:

> The district judge's explanation confirms what complainant alleges and the evidence suggests: The district judge withdrew the reference in a bankruptcy case that was not previously assigned to him, and entered an order in that case based upon information he obtained ex parte from an individual who benefitted directly from that order.

> It is well established that a judge may not exercise judicial power based on secret communications from one of the parties to the dispute. *United States* v. *Thompson*, 827 F.2d 1254, 1258-59 (9th Cir. 1987). The district judge did not, either before or after his ruling, disclose to the parties that this ex parte communication had taken place, its substance or the fact that it formed the basis of his ruling.

> While parties do not have a due process right to the random assignment of cases, a judge may not assign a case in order to affect its outcome. *See Cruz* v. *Abbate*, 812 F.2d 571, 574 (9th Cir. 1987). The judge here withdrew the reference and assigned the case to himself for the very purpose of granting the debtor relief from her imminent eviction.

---

[4]"*Ex parte* communications are those that involve fewer than all of the parties who are legally entitled to be present during the discussion of any matter." *Id.* § 5.01, at 159.

Judicial Council Order (Dec. 18, 2003) at 4-5.[5]

Before remanding the case to the Chief Judge, we ordered a limited investigation into the allegations of the complaint. This investigation was conducted, at the direction of the Judicial Council, by a staff person who called various individuals by telephone. This investigation uncovered evidence that there may have been further communications between the debtor and the district judge concerning her eviction. Among the individuals called by our staff was attorney Andrew

---

[5]The majority claims that "it is . . . a fair question whether these additional matters [other than the allegation of sexual impropriety] are properly within the scope of the complaint." Maj. at 13800. Fairness, like beauty, must be in the eye of the beholder. Our earlier order, remanding the case to the Chief Judge, dealt exclusively with these "additional matters." Were we just whistling in the wind? The Judicial Council has already construed the complaint as encompassing claims beyond sexual impropriety. It is unseemly for my colleagues to now call that considered judgment into question, and do so in a throw-away line with no explanation whatsoever.

In any event, the suggestion that the complaint in this case was limited to "judicial action in exchange for sexual favors," *id.*, is preposterous. While the complaint makes reference to Canter as "an attractive female," there is no reference to sexual favors, nor to any quid pro quo. *See* n.14 *infra*. Complainant clearly suggests that the judge may have been influenced by the debtor's appearance, but he expressly leaves open the nature of their relationship—a matter he suggests be investigated. The gravamen of the complaint is that the judge acted "inappropriately," a term that includes judicial acts based on ex parte communications and the related misconduct that is amply demonstrated by this record. Our duty is to read the complaint fully and fairly, construing the words the complainant actually uses rather than rewriting the complaint so it reads more narrowly than actually written. The standard the majority uses to construe the complaint here is very different from the standard we apply in normal civil litigation. *See, e.g.*, *United States* v. *LSL Biotechnologies*, 379 F.3d 672, 683 (9th Cir. 2004) ("[F]ederal complaints are generally construed liberally . . . ."); *Miranda* v. *Clark County*, 319 F.3d 465, 471 (9th Cir. 2003) (en banc); *Harmon* v. *Billings Bench Water Users Ass'n*, 765 F.2d 1464, 1467 (9th Cir. 1985). I see no justification for applying a different standard here just because the respondent is a federal judge, and the majority offers none.

Smyth, who represented Deborah Canter in the bankruptcy proceedings and also, apparently, in the state-court unlawful-detainer action. This is a summary of that conversation:

Mr. Smyth said that when Deborah Canter filed in bankruptcy, she was being threatened with eviction by her in-laws and going through a nasty divorce. He was also aware that she was on probation and had regular appearances before [the district judge]. The Canter Family Trust moved for relief from the automatic stay in order to pursue its unlawful detainer action in state court, and Mr. Smyth stipulated to an order. He speculated that Ms. Canter may have lost some trust in him after that, but said that he believed that all of her defenses could best be raised in the state court action. He said he was surprised when [the district judge] withdrew the bankruptcy reference and reimposed the stay. At the time he had no idea why [the judge] had done so. He recalls that when the parties questioned [the judge] in court, [the judge] said "Because I said so." Mr. Smyth said that even at the time of the Court of Appeals argument, he and Mr. Katz were still speculating on the reason for [the judge's] action. Mr. Smyth said that he had "absolutely zero evidence" of any improper relationship between [the judge] and Ms. Canter, but was "suspicious" because Ms. Canter was a "cute girl" who projected a "waif" persona that was appealing. At the time he thought that perhaps [the judge] had become aware of her divorce and imminent eviction in the course of one of her probation visits.

Mr. Smyth then said that he had only become aware of the "real" reason for the withdrawal sometime after the Court of Appeals opinion. He explained that his wife and legal secretary Michelle, whom he described as a Korean emigre unfamiliar with the habits of American judges, told him that one

day Ms. Canter had come into the office crying about her circumstances, and that Michelle had offered to help her to compose a letter to [the judge] and told her to go see him. Michelle did "ghostwrite" a letter for Ms. Canter explaining how her husband's family was picking on her and how she was being victimized in the divorce. I asked Mr. Smyth whether he knew if Ms. Canter actually delivered such a letter to [the judge], so he put his wife on the phone. She said that Ms. Canter told her that she had taken the letter in to [the judge]. It was Michelle's understanding that Ms. Canter delivered the letter to [the judge] personally and had some brief discussion with him. Ms. Canter told Michelle that the letter had "worked." I asked Michelle when this delivery took place, and she said she believed it was a day or two before [the judge] withdrew the reference.

In our order remanding the case to the Chief Judge, we noted proof that the judge had withdrawn the reference and stayed the eviction "in response to a direct plea for help from the debtor," Judicial Council Order (Dec. 18, 2003) at 4, and suggested that the matter "be investigated further," *id.*

The Chief Judge, on remand, obtained denials of any such communication from the judge and from Deborah Canter. Based on these denials, the Chief Judge concluded that "there is no basis for a finding that credible evidence exists of a letter or other 'secret communication' having passed between the defendant/debtor and the district judge. There is similarly no basis for finding that there was any private meeting or discussion between them at any time." Chief Judge Order (Nov. 4, 2004) at 5.

The majority declines to "upset that factual finding," maj. at 13799, but the Chief Judge is not a trier of fact, and she did not conduct an evidentiary hearing. Her authority is limited to determining whether there is credible evidence of misconduct,

and she may dismiss the complaint only if credible evidence is entirely lacking. *See* 9th Cir. Misconduct R. 4. That the judge accused of receiving a secret communication and the party who allegedly made the communication both deny it does not negate the fact that we have contrary evidence—the statement of the secretary who claims to have ghostwritten the letter for Deborah Canter and also claims that Canter told her she had delivered the letter and that "[it] had 'worked.' "[6]

The Chief Judge did not contact the lawyer or his secretary and they did not retract the statements they had made to our investigator. Nor can I imagine why they would have lied about this in the first place, as it hardly reflects creditably on their own conduct. At the very least, then, we have a conflict in the evidence that only an adversary hearing can resolve. And an adversary hearing can only be held if the Chief Judge convenes an investigative committee pursuant to Ninth Circuit Misconduct Rule 4(e), which she declined to do.

But there is more here than merely the conflicting state-

---

[6]The two denials are hardly as conclusive as the Chief Judge and the majority want to believe. The district judge made no statements to us at all. Rather, he answered some questions in a letter directed to his own lawyer and the lawyer then passed that information on to the Chief Judge. Neither the judge's statement nor, of course, that of his lawyer is under oath. *See also* p. 13827 *infra* (questioning the veracity of other unsworn statements made to us by the district judge). As for Canter's statement, it is made under penalty of perjury but (as I note on p. 13818 below) says suspiciously more than it needs to. Moreover, the declarant had recently been convicted of felonies of deception. *See* Fed. R. Evid. 609(a)(2). She had also filed five bankruptcy petitions in just over seven years, three of which were dismissed within two months of filing. This is considered evidence of bad faith use of the automatic stay to stall legal proceedings against her. *See In re Knight Jewelry*, 168 B.R. 199, 202-03 (Bankr. W.D. Mo. 1994). When she filed the last of these petitions—the one that is at the heart of our complaint—she signed, also under penalty of perjury, a form required by Local Rule 1015-2, which purported to list all her past bankruptcy petitions, yet she neglected to list any of the four prior petitions on that form. *See* Bankr. C.D. Cal. R. 1015-2.

ments; there is the matter of timing: According to probation office records and the judge's own statement, Canter and the district judge had a probation review meeting in his chambers on January 24, 2000. That was the last such meeting before the district judge withdrew the reference on February 17 and entered his order enjoining the unlawful-detainer judgment on February 29.[7] But, at the time of the January 24 meeting, the bankruptcy court had not yet lifted the automatic stay—that didn't happen until two days later, on January 26. Nor did the state court enter its order of eviction—the one the district judge eventually enjoined—until two weeks later, on February 7.

How then did the district judge know about the state-court eviction order that he eventually enjoined? Once the bankruptcy court lifted its stay, it was no longer concerned with the unlawful-detainer action and there is nothing in the bankruptcy court file reflecting the subsequent eviction judgment. Yet, the district judge was familiar enough with Deborah Canter's situation—including the specific judgment entered in state court two weeks after her probation meeting—that he was able to quash it with cruise-missile accuracy: "Pending further proceedings in this Court the judgment of February 7, 2000, in the matter of ALAN S. CANTER v. DEBORAH MARISTINA ROMANO in Municipal Court No. 99U18116 is stayed." Dist. Ct. Order (Feb. 29, 2000).

Normally, of course, there would be a motion, with declarations and exhibits attached, that would leave no doubt about how the judge learned the information on which he based his decision. But the record here is entirely silent. One plausible inference—perhaps the most likely inference—is that some time after the January 24 probation meeting, Deborah Canter communicated with the judge privately—by letter, by telephone or in person—and advised him that an eviction order had been entered against her, and that she would have to

---

[7]The next such meeting was on April 7, 2000.

move out unless he did something about it lickety-split. The letter, allegedly ghostwritten by Smyth's secretary and delivered by Canter to the district judge, would seem to fit the bill.

But there is still a bit more to this story. Deborah Canter's declaration, in which she denies having written or delivered a letter to the judge, actually contains information not mentioned in the Chief Judge's order:

> 2. I was formerly represented by Andrew Smyth, Esq., in connection with bankruptcy proceedings. At one point in the proceedings I received a call at home from Mr. Smyth's wife and legal secretary, Michelle. She asked me to come in to the office to sign a declaration about an eviction action pending against me. I did so, and at Michelle's request I gave her $50 for an attorney's messenger service to deliver the declaration to the court. Michelle did not specify the addressee, and I do not have a copy of the declaration.

> 3. Approximately one week later, while I was at home, my mother told me that Mr. Smyth's office was on the phone. Mr. Smyth said that an eviction stay order had been issued.

The district judge enjoined enforcement of the state-court judgment on February 29. Approximately a week earlier would have been February 22. What then was this "declaration about an eviction action pending against me" that Canter says Smyth's secretary had her sign and sent off "to the court" by messenger? It's hard to imagine it had anything to do with the unlawful-detainer proceedings, because those were concluded on February 7 with the entry of the eviction judgment. The only case Canter had pending at that time that in any way pertained to her eviction was the bankruptcy, and the only document filed around that time was a motion dated February 25, seeking conversion from Chapter 13 to Chapter 7. Neither

that motion nor Canter's attached declaration makes any reference to the eviction.

Could the "declaration" to which Canter refers in her sworn statement to us actually be the letter that the lawyer's secretary described in her conversation with our investigator? To be sure, the two accounts differ in material respects, but they also have much in common: a conversation between the secretary and Canter, a missive signed by Canter concerning the eviction that was then sent off to the court, an eventual happy result. Could it be that Deborah Canter did sign a letter as described by the secretary? Could Canter be worried that such a letter might turn up, and is she providing herself an out by volunteering information about a declaration so she might later claim she didn't know what she was signing? This could explain why Canter included otherwise extraneous information in a declaration whose only purpose was to deny that she had any private communications with the district judge.

There might well be an innocent explanation for all this, but these are not the kind of details that a careful review of the record should overlook. In light of the other evidence we have as to a secret communication between the debtor and the district judge, leading up to his otherwise inexplicable order enjoining the state-court judgment, I cannot agree that the absence of such a communication has been conclusively established.

The majority, as did the Chief Judge before it, ignores these troubling issues and focuses instead on matters that are wholly irrelevant, such as the fact that the judge eventually transferred the case to another district judge, after suddenly developing doubts as to whether he had acted properly in seizing the case from the bankruptcy court. What the majority and the Chief Judge overlook is that the judge transferred the case *seventeen months* after he had removed it from the bankruptcy court, and just two days after the creditors had filed their mandamus petition with the court of appeals. Given that the dis-

trict judge had developed no doubts whatsoever while maintaining the debtor in the Highland Avenue property for a year and a half, despite two motions by the Trust, this strikes me as a clumsy effort to avoid the inevitable dropping of the hammer by the court of appeals—an implicit acknowledgment of wrongdoing.[8]

---

[8]Worse, the Chief Judge suggests the fault really lies with the debtor's lawyers who hoodwinked the court of appeals by pressing on with the mandamus petition even though the district judge had corrected his own mistake: "For reasons that are not clear, the appellate panel apparently was unaware that at the time of oral argument on the propriety of withdrawal of the bankruptcy reference, the case had long since been returned to Bankruptcy Court and closed by the assigned bankruptcy judge." Chief Judge Order (Nov. 4, 2004) at 6.

This is untrue, unfair and beside the point. One need only listen to the tape of oral argument before the court of appeals—freely available from the clerk of that court—to learn that the court of appeals panel was fully apprised of these events. But this made no difference to the relief requested by the mandamus petitioners because neither this district judge, nor the second district judge (who did, indeed, determine—as has everyone else—that the first judge had no basis for withdrawing the case from the bankruptcy court), bothered to vacate the order enjoining the state-court judgment. The case was thus returned to the bankruptcy court with the injunction intact, and the bankruptcy judge—being lower on the food chain than the district judge—reasonably felt he had no authority to vacate that order. At the time of oral argument in the court of appeals, in March 2002, counsel for the creditors represented that his clients continued to feel bound by the injunction, and reminded the court that "Ms. Canter has now lived in my client's house for three years, rent free." The debtor's counsel agreed that the district judge's order continued to "prevent any action against the debtor." Deborah Canter could not be dislodged from the Highland property until the court of appeals vacated the district court's order impeding the state-court eviction judgment.

The majority seems to be under the impression that the district judge's injunction was terminated in January 2002, when the bankruptcy court "granted the trustee's motion to abandon the estate's interest in the residence in question." Maj. at 13799. If that is what my colleagues are saying —and I can see no other point in mentioning that event—they are simply mistaken. Termination of the bankruptcy proceedings had no effect on the district court's injunction and the creditors were still precluded from enforcing the state-court judgment, even though the debtor had abandoned any interest in the property, until the court of appeals vacated the injunction seven months later.

Why does this matter, anyway? The district judge's misconduct occurred in February 2000, when he seized the case from the bankruptcy court based on information whispered to him by the debtor ex parte, and then stayed her eviction without a stated reason and without first giving the parties aggrieved by the order a chance to argue against it. It occurred again when he denied their two motions for reconsideration with the imperious "Just because I said it, Counsel" as the only reason. *See* p. 13806 *supra*. Had he vacated his order at a later date, this might have mitigated the harm caused by his misconduct, though it could not have undone the misconduct itself. But he didn't even do that much. With the help of another district judge hand-picked by him, the case was trundled back to the bankruptcy court with the order enjoining the state-court judgment intact, and so it remained until the court of appeals issued its mandamus. How or why this series of events serves as "corrective action" for the district judge's misconduct, *see* maj. at 13800-01, is a mystery to me.[9]

Nor, of course, does the mandamus order of the court of appeals, which did find that the district judge had abused his discretion, count as corrective action. *See* maj. at 13800-01. The majority's contrary suggestion does an injustice to the many other district judges who have been reversed for abuse of discretion. When a court of appeals says that a district

---

[9]The Chief Judge also seems to say in her order that the judge's actions were justified by the fact that a copy of the debtor's presentence report had been improperly released and relied upon in the bankruptcy proceedings. Chief Judge Order (Nov. 4, 2004) at 5. The majority doesn't adopt this rationale and for good reason: It is manifestly untrue. The district-court docket in the bankruptcy case reflects no proceedings whatsoever related to the presentence report. In his written statement to us, the district judge admitted that a show-cause order *was* issued to deal with this issue, but in the criminal case. *See* p. 13809 *supra*. The docket in the criminal case confirms this. There was absolutely nothing about the improper release of the presentence report that justified withdrawing the reference in the bankruptcy case, much less the entry of an order enjoining the state-court unlawful-detainer judgment.

judge abused his discretion, this is a legal conclusion that connotes mere error—not wrongdoing. The court of appeals here carefully refrained from saying whether the district judge committed misconduct, mindful no doubt that such determinations are the province of this body. Merely reversing an erroneous judgment that is the product of misconduct does not undo the misconduct. If my colleagues need a clear-cut hypothetical to demonstrate this self-evident proposition, consider a judgment procured by a bribe. That the court of appeals reverses the judgment—which it would do in every instance where the bribe was brought to its attention—does not and cannot insulate the district judge from the consequences of his misconduct on the theory that the misconduct has somehow been cured. *See* Shaman, Lubet & Alfini, *supra*, § 2.02, at 36 ("In some instances . . . legal error may amount to judicial misconduct calling for sanctions ranging from admonishment to removal from office."); *accord Oberholzer* v. *Comm'n on Judicial Performance*, 975 P.2d 663, 679 (Cal. 1999) (legal error "can constitute misconduct if it involves 'bad faith, bias, abuse of authority, disregard for fundamental rights, intentional disregard of the law or any purpose other than the faithful discharge of judicial duty' " (citing cases)); *In re Quirk*, 705 So. 2d at 178 ("egregious legal error, legal error motivated by bad faith, and a continuing pattern of legal error" can also constitute misconduct).

Finally, I find the district judge's slippery statement of contrition risible. As the majority notes, we wrote the district judge and offered to close the matter without further action, provided he acknowledge his "improper conduct" and "pledge not to repeat it." *See* maj. at 13799.[10] This is consistent with the accepted practice of giving judges subject to a valid disci-

---

[10]We also asked that the district judge tender an apology for his actions, a requirement the majority seems to have forgotten. Our letter said: "We believe that, in this case, the most appropriate corrective action would be for you to acknowledge your improper conduct, apologize for it and pledge not to repeat it."

plinary complaint a chance to mitigate or correct their misconduct by an open acknowledgment of wrongdoing, an apology and a pledge to mend their ways. *See, e.g.*, *In re Charges of Judicial Misconduct*, 404 F.3d 688, 700 (Judicial Council of the 2d Cir. 2005).

The district judge's response here falls far short of what I would consider corrective action. First of all, he fails to even acknowledge that he acted based on information he obtained from the party benefitted by his orders, without disclosing this to the opposing parties or giving them an opportunity to correct any misstatements or exaggerations that may have been made to him in private. Our rules governing judicial misconduct proceedings use this precise example of conduct that is sanctionable: " 'Conduct prejudicial to the effective and expeditious administration of the business of the courts' . . . includes such things as . . . improperly engaging in discussions with lawyers or parties to cases in the absence of representatives of opposing parties, and other abuses of judicial office." 9th Cir. Misconduct R. 1(c); *see also* 28 U.S.C. § 351(a); Code of Conduct for United States Judges, Canon 3(A)(4).

Second, the judge withdrew the bankruptcy reference without any legal justification, for no reason other than to benefit the debtor by blocking her eviction. *See id.*, Canon 3(C)(1)(a) (judges should not participate in cases "in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which . . . the judge has a personal bias or prejudice concerning a party"); *see also Cruz* v. *Abbate*, 812 F.2d 571, 574 (9th Cir. 1987) ("While a defendant has no right to any particular procedure for the selection of the judge . . . he is entitled to have that decision made in a manner free from bias or the desire to influence the outcome of the proceedings.").

Third, he acted without notice, in direct contravention of Fed. R. Civ. P. 65(a)(1) which states in categorical terms, "No

preliminary injunction shall be issued without notice to the adverse party."[11] Notice is also one of the bedrock principles of due process and would be required even without the direct command of Rule 65(a). *See Joint Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U.S. 123, 170-72 (1951) (Frankfurter, J., concurring); *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

Fourth, the district judge failed to heed the other explicit procedures applicable to the issuance of an injunction, such as the requirements of a bond and a clear statement of reasons, *see* Fed. R. Civ. P. 65(c), (d), all of which are designed to provide transparency for purposes of appellate review and otherwise protect the interests of the party against which an injunction is entered. This was *twice* pointed out to the judge by the creditors in their motions for reconsideration, with no effect whatsoever. A federal courtroom is not Sherwood Forest; a judge may not take property from one party and give it to another, except by following established rules of procedure. *See* Shaman, Lubet & Alfini, *supra*, § 2.07, at 50 ("Judges abuse the power of the judicial office when they abbreviate or change critical aspects of the adversary process . . . [and] have been disciplined for . . . issuing dispositive orders without making findings of fact or setting forth reasons as required by law . . . .").

Fifth, the district judge acted without even colorable legal authority. To this day, I am unaware of any conceivable legal basis the district judge might have had for enjoining the state-court judgment and keeping the debtor in the Highland Avenue property at the expense of the Trust. *See* p. 13810 n.3

---

[11] It is clear that once an automatic bankruptcy stay is lifted, as happened in this case, it may not be re-imposed. Rather, the judge may act—if at all—only by issuing an injunction pursuant to section 105(a) of the Bankruptcy Code, in which case he must follow the procedures applicable to preliminary injunctions under Fed. R. Civ. P. 65. *See In re Canter*, 299 F.3d at 1155 & n.1.

*supra*. Throughout these lengthy proceedings, the judge has offered nothing at all to justify his actions—not a case, not a statute, not a bankruptcy treatise, not a law review article, not a student note, not even a blawg. He's said nothing that would suggest he was mistaken—perhaps badly mistaken—but nevertheless acting in good faith. By his silence, the district judge has implicitly acknowledged that his orders were a raw exercise of power, unsupported by any authority other than that of his commission. *See* Shaman, Lubet & Alfini, *supra*, § 2.02, at 38 ("Intentional refusals to follow the law are another manifestation of unfitness for judicial office."). Congress has surely not made us the most powerful judges in the world so we can bestow thousands of dollars of bounties on our personal favorites whenever we feel like it.

Sixth, the district judge has failed to acknowledge the serious harm he caused the Trust through his improvident actions. Not only was it forced to host the debtor on its property rent-free for years—at a cost estimated by the court of appeals at $35,000—but it also had to spend money on lawyers to bring two motions for reconsideration and a mandamus petition in the court of appeals. Bankruptcy lawyers don't come cheap, and I'd be surprised if the legal costs associated with undoing the harm inflicted by the district judge didn't run into the tens of thousands of dollars. *See Miss. Comm'n on Judicial Performance* v. *Perdue*, 853 So. 2d 85, 91 (Miss. 2003) (party aggrieved by judge's ex parte order incurred "attorneys fees in excess of $13,000.00").[12]

---

[12]*Perdue* is a case remarkably like our own. The judge there granted a custody decree based on information provided to her ex parte. *Id.* at 92. Her order "stated no basis for jurisdiction," *id.*, was entered "without a petition being filed," *id.* at 91, and "there was no indication of any appearances, testimony, or evidence taken in the matter," *id.* at 92. Later, "when presented with a golden opportunity to right the wrong, Judge Perdue refused to even discuss the [matter]," *id.*, referred the case to another court, "thereby keeping in effect" her ex parte order, *id.* at 93, and "attempt[ed] to divert . . . attention from her actions" by placing the blame on the aggrieved party, *id.* at 96. The Mississippi Supreme Court found it "es-

Of all these things, the judge says nothing at all; he steadfastly refuses to admit any wrongdoing. What he seems to acknowledge—though it's hard to tell from his lawyer's guarded language—is that he should have communicated the reasons for his actions better, pretending that, had he done so, "misunderstandings by the parties could have been prevented." This is patently absurd. The problem at the root of the district court's actions lay in the fact that he *had* no reasons—at least no legitimate reasons—for doing what he did. What could he possibly have said that might have avoided "misunderstandings" by the Trust? Would the trustees have been placated had the judge told them that he had chatted with Deborah Canter in their absence and that, based on that conversation, he was convinced they had given her a raw deal? Any attempt on the judge's part to explain would only have made it clear that his orders lacked legal authority and were based on ex parte communications. The judge's failure to explain was not a foible; it was part and parcel of a calculated effort to maintain the debtor in the Highland Avenue property rent-free for as long as possible, and elude what he doubtless feared would be the adverse personal consequences of such an admission.

Nor does the judge's statement contain a pledge not to repeat his wrongful conduct. What he says, with uncharacteristic coyness, is that "[h]e does not believe that any similar situation will occur in the future." Perhaps he does not believe that any similar situation will occur because he doesn't expect to encounter a similar set of facts; it is hardly a commitment to act differently in similar circumstances. It reflects poorly on this body that, after asking the district judge for a pledge,

---

pecially troublesome" that the judge "fail[ed] to acknowledge her wrongdoing, or even that she may have made a mistake." *Id.* Based on these considerations, the court suspended the judge without pay for 30 days and assessed her the cost of the disciplinary proceedings. *Id.* at 98. The Mississippi Supreme Court's thorough and thoughtful opinion in *Perdue* contrasts favorably with the Judicial Council's summary order in our case.

my colleagues settle for something as binding and precise as a weather forecast.[13]

Worse still, my colleagues turn a blind eye to evidence that the accused judge may have been less than forthright in his communications with the Judicial Council. Recall that his explanation for issuing the injunction was that he thought Canter was "contesting her right to occupancy [of the Highland property] in the divorce court," and he "re-imposed the stay to allow the state matrimonial court to deal with her claim." *See* p. 13808 *supra*. In its second motion to have the injunction lifted, the Trust informed the district judge that the matrimonial court *had* by then adjudicated the issue, and had concluded that Canter had no rights in the property. Attached to the motion was the order of the state divorce court, entered after a five-day trial, which included the following finding: "The court finds that neither Petitioner [n]or Respondent have any ownership interest in the residence located at . . . Highland Avenue, Los Angeles, California 90036, so therefore, there is no community property interest in said property under any theory of community property law."

Had the judge been motivated, as he now claims, by the desire to maintain the status quo until ownership of the property was resolved by the matrimonial court, one would think he would have rescinded his order once he learned that the matrimonial court had resolved the issue against the debtor. But no—nothing of the sort. What he did do was to summarily deny the motion and refuse to give reasons. *See* pp.

---

[13]The fact that the judge does not speak to us directly, but in the third person through his lawyer, sheds further doubt on his sincerity. *Cf. In re Charges of Judicial Misconduct*, 404 F.3d at 691-92, 700 (complaints dismissed after judge writes his own letter of apology). I seriously doubt that many of my colleagues would be persuaded that a criminal defendant has accepted responsibility for his misconduct based on a statement from his lawyer that the defendant does not believe such a situation will arise again in the future. It does not inspire confidence in the federal judiciary when we treat our own so much better than we treat everyone else.

13805-06 *supra*. By leaving the injunction in place after the debtor had been found to have no rights in the property, the judge enabled her to live there rent-free for another two years —until the court of appeals finally vacated the order by writ of mandamus. This sequence of events makes it perfectly clear that the judge was far more concerned with giving Deborah Canter a free place to live than with preserving any rights she may have had under state law.

The fact of the matter is that the judge's conduct here caused real harm. It certainly harmed innocent creditors to the tune of $50,000 or more. Worse, it harmed public confidence in the fair administration of justice in the courts of this circuit. The prohibition against ex parte communications, rules of procedure, principles of law—all of these are not trinkets that judges may discard whenever they become a nuisance. Rather, they are the mainstays of our judicial system, our guarantee to every litigant that we will administer justice, as our oath requires, "without respect to persons." 28 U.S.C. § 453.

"All of the foundations of judging—such as respect for the text of the law and precedent—reinforce the message of impartiality." M. Margaret McKeown, *Don't Shoot the Canons: Maintaining the Appearance of Propriety Standard*, 7 J. App. Prac. & Process 45, 53 (2005). When a judge acts in accordance with the rules of procedure, when he gives reasons for his orders, when he allows both sides equal and open access to him, when he follows the law, he ensures not merely that justice is done, but that it appears to have been done. When, on the other hand, a federal judge exercises the vast powers entrusted to him by Congress based on secret communications with one party, when he fails to give the opposing side an opportunity to speak, when he refuses to give reasons for his actions, when he does not cite legal authority, when he stubbornly and laconically sticks to his guns despite repeated requests for reconsideration or an explanation, he inevitably

gives rise to the suspicion that he acted for personal and improper reasons rather than according to the rule of law.

The complaint here brought this matter to our attention and plausibly suggested an inappropriate motive for the judge's actions. Complainant is surely not alone in his suspicions, as evidenced by this exchange in the argument before the court of appeals on the mandamus petition:

> JUDGE THOMAS: But you didn't ask for a reimposition of the stay or the injunction, right?
>
> MR. SMYTH: No. That is correct. I did not. It was a surprise he suddenly did.
>
> JUDGE THOMAS: Surprised you. And you have no explanation as you stand here today of why he did it.
>
> MR. SMYTH: No. Just a guess.
>
> JUDGE THOMAS: And what's your guess?
>
> MR. SMYTH: That he, one, he possibly felt my client was being ill served and that I so readily stipulated to lift the stay. He had had her as a client, not a client, a . . .
>
> JUDGE THOMAS: Defendant.
>
> MR. SMYTH: And she gives the kind of little girl lost, doesn't know what she's doing, she needs protection, everyone's picking on her, and I think he probably

> stepped in because his thought was that her lawyer wasn't doing a good [job], so I'll just preserve the status quo, let her have her stay. But again, I'm just trying to guess, you know counsel asked [the judge] why, and . . .

When opposing counsel was asked a similar question, his silence spoke more eloquently than any statement might have:

> JUDGE RAWLINSON:    Counsel what is your speculation as to why the Judge sua sponte lifted, reimposed the stay?
>
> MR. KATZ:    Judge Rawlinson, I would prefer not to answer that question.

A judge must not put himself in a position where the parties to the dispute suspect him of acting out of personal motives rather than according to law. By his unorthodox behavior in this case, the district judge did precisely that and I, for one, cannot say that these suspicions are unfounded.[14]

---

[14]My colleagues are too quick to dismiss complainant's suggestion of an improper relationship between the district judge and the debtor as "entirely unfounded," maj. at 13798, or even "scurrilous," Winmill dissent at 13837. Here is what complainant says, after pointing out that he had conducted "a little district court docket research" and discovered that Deborah Canter had been placed on probation by the district judge:

> It would appear to a reasonable observer who knew all these facts that something inappropriate happened here, beyond what the court [of appeals] discussed. What I mean to say is that it appears that [the district judge] acted inappropriately to benefit an attractive female whom he oddly had placed on probation to himself, and, if this occurred, then it would constitute extreme judicial misconduct.

The majority claims that the issues raised by the dissenters "are factually and legally complex" and that it is therefore "not surprising that all members of the Council do not agree on the correct resolution of these issues." Maj. at 13800. Perhaps it's not surprising that we disagree, but I *do* find it surprising that I still don't know *why* we disagree, because the majority refuses to engage the issues. Complexity of the issues does not excuse a tribunal from confronting them. I also find it surprising that, despite what the majority claims is its "close and diligent attention to this matter over a period of many months," *id.*, my colleagues can't even figure out whether the judge's conduct "crosses over the line from inappropriate conduct to misconduct," *id.* at 13801. A Judicial Council order in a misconduct case is not a jury verdict; the accused judge and the public are entitled to a decision that resolves the issues presented, no matter how difficult or complex they may be. Unfortunately, the majority's exiguous order seems far more concerned with not hurting the feelings

---

It is requested that this matter be appropriately investigated to determine, among other things, the actual relationship between Deborah Canter and [the judge].

This is no different from what her own lawyer told the court of appeals, *see* pp. 13829-30 *supra*, or our investigator, *see* pp. 13814-15 *supra*. Unfortunately, the judge's otherwise inexplicable actions invite such speculation. Whether the judge acted out of a misplaced sense of chivalry toward what he saw as a damsel in distress or for some other reason, I don't know. What I do know is that he did not act for judicially appropriate reasons and this alone justifies complainant's suggestion that the judge may have "acted inappropriately."

I am well aware of the numerous misconduct complaints by disgruntled litigants who claim that they lost because the judge had some secret relationship with the prevailing party. Such complaints are routinely—and properly—dismissed by the Chief Judge because the accused judges followed normal procedures and there is no evidence whatsoever to support the allegations. This case is quite different because the district judge did *not* follow normal procedures and thus forfeited the presumption of regularity that normally attaches to judicial actions.

of the judge in question. But our first duty as members of the Judicial Council is not to spare the feelings of judges accused of misconduct. It is to maintain public confidence in the judiciary by ensuring that substantial allegations of misconduct are dealt with forthrightly and appropriately. This the majority has failed to do.

We are all human and do things we have reason to regret later. The transgression here, however, was particularly egregious and protracted, and despite numerous opportunities to do so, the district judge has steadfastly refused to own up to it. I therefore cannot agree either with the Chief Judge's conclusion that no misconduct occurred or the majority's conclusion that there has been sufficient corrective action to justify dismissal of the complaint. Rather, I believe that serious misconduct has been clearly established[15] and discipline must be imposed consisting of nothing less than a public reprimand and an order that the district judge compensate the Trust for the damage it suffered as a result of the judge's unlawful injunction.

I also believe that the aggrieved creditors are entitled to an apology from the judges of our circuit for the cost, grief and inconvenience they suffered in one of our courts because of the district judge's unprofessional behavior. The judge who committed the misconduct refuses to offer such an apology and it is therefore up to us. Because I cannot speak for the Judicial Council, a majority of whose members see far too little wrong with what the district judge here did, I offer mine.

---

[15]I reach this conclusion without taking into account the unresolved issue as to whether the debtor communicated with the judge via a secret letter after her January 24, 2000, probation review meeting. While I believe that issue deserves further investigation for the reasons I explain above, I agree with Judge Winmill that misconduct has been established based on the public record and the judge's own admissions.

**Appendix: Judicial Council Order (Dec. 18, 2003)**

# JUDICIAL COUNCIL OF
# THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br><br>COMPLAINT OF JUDICIAL MISCONDUCT | No. 03-89037<br><br>ORDER |

Before: Arthur L. Alarcón, Alex Kozinski,
Sidney R. Thomas, M. Margaret McKeown and
William A. Fletcher, Circuit Judges, and PATEL, HUFF,
COUGHENOUR, HATTER and SHANSTROM,
District Judges.

A complaint of judicial misconduct was filed against a district judge of this circuit pursuant to 28 U.S.C. § 351-64. Complainant, an attorney who was not involved in the matters alleged in the complaint, claims that the district judge committed misconduct in the handling of a bankruptcy matter, which has been the subject of an adverse ruling by the Court of Appeals. *See In re Canter*, 299 F.3d 1150 (9th Cir. 2002). Specifically, complainant alleges that the district judge acted improperly in withdrawing the reference from the bankruptcy court and then re-imposing the automatic stay that the bankruptcy court had vacated on the motion of certain creditors. Re-imposition of the stay precluded the creditors from enforcing an unlawful-detainer judgment that would have entitled them to immediate possession of premises occupied by the debtor. The Chief Judge dismissed the complaint, noting that "[a] complaint will be dismissed if it is directly related to the merits of a judge's ruling or decision in the underlying case." Chief Judge Order at 2 (citing 28 U.S.C. § 352(b)(1)(a)(ii); 9th Cir. Misconduct R. 4(c)(1)).

While legal error alone will not amount to misconduct, the converse is not necessarily true: Misconduct can cause error.

That a judge's ruling can be, or has been, subject to appellate review does not automatically insulate the judge's conduct from disciplinary proceedings. Jeffrey M. Shaman, Steven Lubet & James J. Alfini, *Judicial Conduct and Ethics* § 2.02, at 36 (3d ed. 2000) ("In some instances . . . legal error may amount to judicial misconduct calling for sanctions . . . ."). If the misconduct claimed consists of nothing more than the judge's erroneous ruling, the complaint will be deemed to be "directly" related to the subject of the underlying proceeding, and must be dismissed summarily by the Chief Judge. However, where the complainant presents solid evidence that the judge's ruling was the result of "conduct prejudicial to the effective and expeditious administration of the business of the courts," 28 U.S.C. § 351(a), then such underlying conduct will not be deemed "directly" related to the merits of the ruling and the Chief Judge must make an initial determination whether it amounts to misconduct. In so doing, she must bear in mind that "[t]he purpose of the complaint procedure is to improve the administration of justice in the federal courts by taking action when judges engage in conduct that does not meet the standards expected of federal judicial officers." 9th Cir. Misconduct R. 1(a).

Complainant alleges, and the public record supports these allegations, that the district judge withdrew the reference from the bankruptcy court and re-imposed the stay without a motion from any party. The district judge gave no explanation for his actions, despite repeated inquiries from the aggrieved creditors. At the time of the bankruptcy proceeding, the debtor was on probation in a criminal case presided over by the district judge. The district judge had placed the debtor-defendant under his personal supervision, which means that he met with her and the probation officer personally at 120-day intervals. Probation office records indicate that there had been a meeting between the debtor, the probation officer and the district judge less than a month before the judge withdrew the case from the bankruptcy court. In response to an inquiry from our council, the debtor's bankruptcy attorney claimed

that, unbeknownst to him, his secretary had drafted a letter from the debtor to the district judge, asking for his help in preventing her eviction. According to the secretary, the letter was delivered by the debtor "a day or two before . . . [the district judge] withdrew the reference," and the next time they saw each other, the debtor told her "the letter had 'worked.' " Though this information is based on hearsay and should be investigated further, it suggests the district judge may have withdrawn the reference in response to a direct plea for help from the debtor.

In response to our inquiry, the district judge gives the following explanation:

> I felt . . . [the bankruptcy case] was related to my program of working with probationers to help their rehabilitation. I have been doing this for more than 25 years and have been told by the Probation Officer that it is a successful program. In this case a person who was a probationer in a criminal case informed me that the home in which she and her husband were living at the time of their divorce had been given to them by her husband's parents. She was still living in the house with her 8 year old daughter and was in divorce proceedings. She was contesting her right to occupancy in the divorce court and I felt it should be finalized there so I re-imposed the stay to allow the state matrimonial court to deal with her claim. From her explanation of the proceedings in the state court it appeared to me that her counsel had abandoned her interest so it could not be adequately presented to the state court. . . .

> . . . .

> I have no exact memory of any specific conversation with . . . [the debtor] concerning the withdrawal of the reference in the bankruptcy matter. But what

> I can re-construct from the records I have in the
> criminal case is that at a 120 day meeting with . . .
> [the debtor] in connection with her performance of
> community service[, she] advised me that there was
> an unlawful detainer action pending in the Municipal
> Court to evict her from the property in which she and
> her minor daughter were living that was nominally
> owned by . . . [the creditors] but was given to them
> when she married her then estranged husband.

The district judge's explanation confirms what complainant alleges and the evidence suggests: The district judge withdrew the reference in a bankruptcy case that was not previously assigned to him, and entered an order in that case based upon information he obtained ex parte from an individual who benefitted directly from that order.

It is well established that a judge may not exercise judicial power based on secret communications from one of the parties to the dispute. *United States* v. *Thompson*, 827 F.2d 1254, 1258-59 (9th Cir. 1987). The district judge did not, either before or after his ruling, disclose to the parties that this ex parte communication had taken place, its substance or the fact that it formed the basis of his ruling.

While parties do not have a due process right to the random assignment of cases, a judge may not assign a case in order to affect its outcome. *See Cruz* v. *Abbate*, 812 F.2d 571, 574 (9th Cir. 1987). The judge here withdrew the reference and assigned the case to himself for the very purpose of granting the debtor relief from her imminent eviction. The debtor, represented by her counsel, had stipulated to a judgment requiring her to vacate the premises, and the unlawful-detainer court had entered the judgment. The district judge acted based on his belief that the dispute over possession of the property should be "finalized" in the divorce proceeding rather than the unlawful-detainer proceeding, because "it appeared to . . . [him] that her counsel had abandoned her interest so it could

not be adequately presented to the state court." However, we are not aware of any authority for a bankruptcy court to determine whether parties in state court proceedings were adequately represented by their counsel. Nor are we aware of any authority allowing the district court to allocate jurisdiction between two state courts dealing with related subject matter.

That the district judge believed his actions would help his probationer's rehabilitation is of no consequence. A judge may not use his authority in one case to help a party in an unrelated case. Exercise of judicial power in the absence of any arguably legitimate basis can amount to misconduct.

The line between abuse of discretion and misconduct is not always clear. It depends, rather, on the balancing of a variety of factors. *See* Shaman, *supra*, § 2.02. We need not decide whether that line was crossed in this case. We hold only that the Chief Judge erred in dismissing the complaint as frivolous or unsubstantiated; it is plainly neither. We therefore vacate the Chief Judge's dismissal order and remand to the Chief Judge for further proceedings consistent with our order.

Judges Huff, Coughenour, Hatter and Shanstrom would affirm the order of dismissal.

WINMILL, District Judge, dissenting:

I agree with the majority opinion that we should affirm the Chief Judge's finding that the allegations of an inappropriate personal relationship are baseless. Indeed, the charges are not only baseless, but scurrilous and contemptible.

There remains, however, persuasive evidence of misconduct that has not been addressed by either the Chief Judge or the majority. The majority approaches this issue by finding that if any misconduct has been committed, it was corrected

by (1) the finding in *Canter* that the district judge committed an abuse of discretion, *In re Canter*, 299 F.3d 1150, 1152 (9th Cir. 2002); (2) the district judge's referral of the case to another judge who ultimately sent the case back to the bankruptcy court, and (3) the district judge's apology.

I disagree with both the methodology of this approach and its conclusions. It is impossible to determine if misconduct has been corrected until the misconduct is precisely identified. Once the misconduct is identified in this case, it becomes clear that it has never been corrected.

The analysis must begin by asking whether there is misconduct. The complaint alleges that the district judge committed misconduct by enjoining the eviction of Ms. Canter on the basis of ex parte information without giving anyone notice or a chance to respond. The record supports this charge. In letters to the Council, the district judge himself explains that on the basis of ex parte information he received from Ms. Canter, he decided to benefit her by enjoining a state court judgment evicting her from the home in which she was residing. Ms. Canter did not own that residence, and the district judge gave the owners no notice and no opportunity to be heard. By staying the eviction, the district judge allowed Ms. Canter to occupy "the property rent-free for almost three years, resulting in a $35,000 loss of rental income." *Canter*, 299 F.3d at 1154.

Dispensing an ex parte favor without notice or an opportunity to be heard is "conduct prejudicial to the effective . . . administration of the business of the courts." *See* 28 U.S.C. § 351(a); *see also Rule 14(f) of the Rules of the Judicial Council of the Ninth Circuit Governing Complaints of Judicial Misconduct or Disability.* This phrase includes "improperly engaging in discussions with . . . parties to cases in the absence of representatives of opposing parties, and other abuses of judicial office." *Id. at Rule 1(c).* The district judge's conduct appears to fall precisely within this definition. His

conduct also appears to violate Canon 3(a)(4) of the Code of Conduct for United States Judges, which directs judges to accord to the parties a "full right to be heard according to the law."

Of course, the Canons are only guidelines, and so not all violations of the Canons amount to misconduct. *In re Charge of Judicial Misconduct*, 62 F.3d 320 (9th Cir. 1995). However, dispensing an ex parte favor, without giving anyone notice or an opportunity to be heard, goes beyond a disregard for guidelines, and strikes at the very heart of due process. It is not merely "prejudicial" but is outright destructive "to the effective administration of the business of the courts."

Once the misconduct is identified in this way, the three corrective actions identified by the majority can be seen in a different light. First, the finding in *Canter* that the district judge abused his discretion is a resolution of an appellant's legal claim, not an admonishment of a judge's conduct. Indeed, *Canter* never addressed in any way the misconduct issue before us.

Second, the district judge's referral to another judge for review did not occur until seventeen months had passed from the date the stay of eviction was entered. This action did nothing to correct the original misconduct of staying the eviction based upon an ex parte communication and without notice or an opportunity to be heard.

Finally, while it is commendable that the district judge apologized for failing to explain his actions, that apology misses the mark. The misconduct is not the failure to explain, but the granting of an ex parte favor without giving anyone notice or a chance to respond. The district judge has never apologized for that. Because the district judge's apology fails to address the misconduct, it cannot be deemed corrective action.

Judge Kozinski's dissent reveals in much more detail the powerful and persuasive evidence of misconduct in this case. Ultimately, however, I cannot join his dissent because the district judge has had no opportunity to provide a defense. While the district judge submitted letters in response to questions, he has never been given a full opportunity to present his defense.

Given that, we should invoke our authority under Rule 5 to "return the matter to the Chief Judge for further action," and direct the Chief Judge to use her authority under Rule 4(e) to appoint a Special Committee, constituted as provided in Rule 9, to resolve the issues raised here. Under Rule 11, the Special Committee has the authority to hold hearings where the district judge may put on a full defense, including witnesses if necessary.

The record in this case creates a stark appearance of misconduct. A further investigation is absolutely necessary, and therefore I cannot join in the majority opinion. At the same time, I cannot join in Judge Kozinski's dissent: If we rush to judgment, we deny to the district judge the very due process that he is accused of denying to others. By allowing the district judge a formal opportunity to respond to these very serious charges, we preserve his rights and confront the misconduct issue directly. For these reasons, I have filed this separate dissent.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2005 Thomson/West.